# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| ED FOSTER, et al., | : | |
| | : | |
| Plaintiffs, | : | Case No. 01-CV-514 |
| | : | |
| v. | : | JUDGE ALGENON L. MARBLEY |
| | : | |
| D.B.S. COLLECTION AGENCY, et al., | : | Magistrate Judge Kemp |
| | : | |
| Defendants. | : | |

## OPINION AND ORDER

## I.  INTRODUCTION

This matter is before the Court on Intervenor-Defendant Northland Insurance Company's ("Northland") Motion for Declaratory Summary Judgment.  Northland asks this Court to declare that it does not have to defend or indemnify Defendants D.B.S. ("D.B.S.") and Kathy Dickerson on several of the claims against them in this action.  Plaintiffs oppose this Motion and Defendants D.B.S. and Dickerson failed to respond.  For the reasons stated herein, Northland's Motion for Summary Judgment is **GRANTED in part and DENIED in part**.

## II.  FACTS

### A.  Background

On April 28, 1982, Mary Jane Slaughter ("Ms. Slaughter") registered the fictitious name "D.B.S. Collection Agency" ("D.B.S.")  with the Ohio Secretary of State.  Ms. Slaughter renewed the registration in February 1997, thereby extending the validity of the registration until February 2002.  Ms. Slaughter then transferred D.B.S. and the right to use that fictitious name to Michael Slaughter ("Mr. Slaughter") on August 10, 1998.  Coffman, an attorney, handled the

transaction.  At that time, Mr. Slaughter did not register the transfer of the right to use the fictitious name "D.B.S. Collection Agency" or his ownership of the business operating under that name with the Ohio Secretary of State.

After the transfer to Mr. Slaughter, Defendants continued to collect consumer debts under the name, and on behalf of, D.B.S.  Defendants succeeded in collecting some of those debts by regularly commencing and maintaining actions for debt collection in various Ohio courts.  After prevailing in such actions, Defendants collected and executed the judgments that they were awarded, sometimes through the use of garnishment and attachment of debtors' property. Plaintiffs allege that Defendants' debt collection activities customarily involved the use of mail, telephones, and interstate facilities for data transmission.

On March 1, 1999, Mr. Slaughter transferred D.B.S. and the right to use its fictitious name to  Defendant Kathy Dickerson ("Dickerson").  Again, Coffman handled the transfer.  At that time, Dickerson did not register with the Ohio Secretary of State either the transfer of the right to use the fictitious name "D.B.S. Collection Agency" or her ownership of the business operating under that name.

Plaintiffs allege that after the transfer from Mr. Slaughter, Defendants continued to collect consumer debts under the name "D.B.S. Collection Agency."  Defendants continued to collect debts after commencing, maintaining, and prevailing on actions that they filed in various Ohio courts.  They then enforced the judgments that they were awarded by garnishing and attaching debtors' property.

## 1.  Coffman's Representation of D.B.S.

In 1996, Ms. Slaughter sought legal assistance from Coffman in assuring that her sole proprietorship of D.B.S. complied with the Fair Debt Collection Practices Act, the primary federal law regulating her debt collection business. Coffman initially assigned an employee, Mr. Randy Godard, Esq., to advise Ms. Slaughter.

In early 1997, Coffman began signing complaints naming D.B.S. as the sole plaintiff in civil debt collection actions filed against consumers in at least two Zanesville, Ohio area state courts. Until approximately the end of November 2002, Coffman signed the complaints initiating D.B.S.'s debt collection lawsuits. During the five-year period when he represented D.B.S., Defendant Coffman appeared on bankruptcy, foreclosure, and subrogation matters. Coffman exclusively handled D.B.S.'s consumer collection litigation.

These debt collection suits, mostly filed in Muskingum County, used a standard civil complaint supplemented with a specially prepared "exhibit A," listing the debts D.B.S. claimed it was owed. Both the complaints and the "exhibit As" were always drawn up for Coffman's signature by D.B.S. The complaint form that Coffman signed to commence these lawsuits for D.B.S. remained substantively unchanged throughout the five-year period that he filed such cases for D.B.S.[1] Between 1997 and November 2002, Coffman recovered judgment for D.B.S. on approximately 500 lawsuits commenced with this standard complaint.

Moreover, D.B.S. routinely filed debt collection lawsuits as a general business practice. None of D.B.S.'s clients—Orthopaedic Associates, Perry County Family Practice, Muskingum Emergency Physicians, Prime Care, Podiatric Associates, and others—used their own attorneys

---

[1]The complaint Defendant Coffman signed in November 2000 to initiate suit by D.B.S. against the named Plaintiffs, Ed and Carla Foster (collectively, the "Fosters"), is an example of the standard complaint with an attached  "exhibit A."

to collect debts. Instead, they collected the debts owed to them through D.B.S. D.B.S. filed

these suits in order to gain the power to garnish the wages of these debtors.

Many debtors paid their alleged debt to D.B.S. after being served with a lawsuit.

Otherwise, the lawsuits would typically end in default judgment in favor of D.B.S.

D.B.S.'s standard complaint contained six allegations:

(1) that D.B.S. was the only plaintiff;

(2) that D.B.S., a "debt collection agency," had taken assignment of their debts from the

original creditors;

(3) that the debtor now "owe[s] to Plaintiff [D.B.S.]" all debts listed in the "exhibit A"

complaint attachment;

(4) that D.B.S. was itself entitled to demand and recover judgment;

(5) that judgment could be entered against all debtors listed in the complaint jointly; and

(6) that the court's judgment should include "[c]ourt filing fees in the amount of Sixty

Dollars ($60.00), together with interest at the maximum legal rate from the date of

judgment, for costs and for attorney fees."

## 2. D.B.S.'s Debt Collection Lawsuit Against the Fosters

On November 3, 2000, Defendants commenced a civil action under the name "D.B.S.

Collection Agency" against the Fosters jointly in the Zanesville, Ohio Municipal Court to collect

consumer debts that the Fosters allegedly owed to various third-party creditors. After service of

the complaint by certified mail, Mr. Foster called D.B.S. and spoke to Dickerson. Mr. Foster

alleges that Dickerson told him that D.B.S. had the right to garnish his wages $600 to $700

bi-weekly and Mrs. Foster's earnings $200 to $300 per month. Mr. Foster explained that such

4

garnishment would financially devastate his family.  He proposed, instead, that the parties arrange a $500 per month payment plan to end the lawsuit.  Mr. Foster believed that he and Dickerson agreed upon a $500 per month payment plan, in exchange for dismissal of the debt collection suit.[2]  Pursuant to Mr. Foster's understanding of the conversation, he paid D.B.S. a $500 installment check on November 17, 2000.

D.B.S. did not dismiss the civil action filed against the Fosters in municipal court. Instead, on January 4, 2001, without prior notice to Plaintiffs, Dickerson prepared and filed court documents on behalf of D.B.S. for a default judgment against the Fosters.[3]  Dickerson did not inform the court that she had an intervening telephone conversation with Mr. Foster.  The municipal court entered default judgment against the Fosters.

After obtaining default judgment, Dickerson attached the Fosters' household checking account by sending the court orders directly to their bank, without providing notice of such action to the Fosters.  Both Mr. and Mrs. Foster's employers directly deposit their paychecks into their bank accounts.  Consequently, Dickerson's attachment froze the Fosters' cash assets without prior notice to them.  As a result, the Fosters allege that they were left without funds for basic necessities, and that their bank dishonored outstanding checks.  The Fosters also contend

---

[2]Mr. Foster alleges that this arrangement was entered into during a telephone conversation, despite his contention that, during the same conversation, Dickerson explicitly told Mr. Foster that she would not accept the proposed payment plan because D.B.S. had the right to garnish his wages, as discussed above.

[3]The Fosters assert that they did not file an answer to Dickerson's complaint because they presumed the case had ended after Mr. Foster's telephone conversation with Dickerson.

that Dickerson failed to schedule a court hearing on the ex parte attachment of their bank account within the time required by law, thus causing them further economic and emotional loss.[4]

On January 25, 2001, the Fosters notified Defendants that the attachment of their bank account was void ab initio and that Dickerson, who regularly signs pleadings in civil actions under the name D.B.S., was illegally practicing law. The Fosters based their allegations on the fact that the records of the Ohio Secretary of State at that time showed the lawful owner and registrant of D.B.S. to be Mary Jane Slaughter. Dickerson appeared before the Zanesville Municipal Court on January 25, 2001, to oppose the release of her attachment on the Fosters' bank account. She informed the court that she owned D.B.S. pursuant to the transfer from Mr. Slaughter in March 1999. The municipal court discharged the attachment.

On February 23, 2001, the municipal court heard evidence on the Fosters' motion to vacate the default judgment entered against them. Coffman appeared as counsel for D.B.S., and Dickerson testified on behalf of D.B.S. During the hearing, Dickerson testified that she had not registered her ownership or use of the name "D.B.S. Collection Agency" with the Secretary of State.

On March 2, 2001, Mr. Slaughter registered the August 10, 1998 transfer of ownership of D.B.S. to him from Ms. Slaughter. At the same time, Dickerson registered the March 1, 1999 transfer of ownership of the "D.B.S. Collection Agency" business and name to her from Mr. Slaughter. Coffman prepared the registrations and filed copies with the municipal court. The

---

[4]The Fosters have not specified how this failure to schedule a court hearing caused them damage that extended beyond the damage caused by the attachment itself.

business address listed for D.B.S. on Dickerson's application for registration listed the same
address for D.B.S. that had been registered by Ms. Slaughter in 1997.

On March 28, 2001, the municipal court vacated the January 4, 2001, default judgment
against the Fosters because, at the time judgment was entered, D.B.S. and Dickerson lacked the
legal capacity to commence or maintain a civil action under the name "D.B.S. Collection
Agency" due to the lack of proper registration.  The municipal court also recognized that,
pursuant to her March 2, 2001, registration, Dickerson now had legal capacity to sue the Fosters
such that the action previously filed could remain pending.

### B.  Procedural History

Based on the aforementioned facts, the Fosters filed a Complaint with this Court on May
30, 2001 (the "Complaint"), on behalf of themselves and all others similarly situated.  In the
Complaint, Plaintiffs sought to recover based on: (1) the federal Fair Debt Collection Practices
Act, 15 U.S.C. § 1692 *et seq.* ("FDCPA"); (2) the Ohio Consumer Sales Practices Act, O.R.C. §
1345.01 *et seq.* ("OCSPA"); (3) common law fraud; (4) the Ohio Pattern of Corrupt Activities
Act, O.R..C. § 2923.31 *et seq.* ("OPCA"); and (5) 42 U.S.C. § 1983.

In an Order dated March 8, 2002, this Court granted in part and denied in part D.B.S. and
Dickerson's Motion for Judgment on the Pleadings.  Pursuant to that Order, the OCSPA and
negligence claims were dismissed.  Pursuant to an Opinion and Order dated March 25, 2002, this
Court granted the Plaintiffs' Motion to Certify a Class under Rule 23(b)(3), while denying
Plaintiffs' Motion to Certify a Class under Rule 23(b)(2).  The Court certified a class defined as,

> All persons named as a party defendant in any Ohio civil action filed between
> August 10, 1998, and March 1, 2001, in which "D.B.S. Collection Agency"
> was the named Plaintiff.

The Court also certified a subclass defined as,

> All such persons as to whom one or more of the defendants did or will engage in any debt collection activity thereto on or after March 2, 2001.

On February 20, 2003, after Defendants' petition to the Sixth Circuit for leave to appeal the class certification Order was denied, this Court granted Plaintiffs' Motion for an Order to Approve and Issue Class Notice.

On March 6, 2003, the Court issued two Orders. The Court granted in part Plaintiffs' Motion for Reconsideration of the March 8, 2002, Opinion and Order on Defendants D.B.S. and Dickerson's Motion for Judgment on the Pleadings, reinstating Plaintiffs' claims under the OCSPA. The Court also granted in part and denied in part Defendant Coffman's Motion for Judgment on the Pleadings, dismissing the negligence claim but not the OCSPA claim as to Defendant Coffman.

In an Opinion and Order dated December 16, 2003, the Court granted Plaintiffs' Motion to Amend the Class Definition. Following that ruling, the Court adopted Plaintiffs' proposed definition for the certified class and subclass:

> All persons named as a party defendant in any Ohio civil action filed with "D.B.S. Collection Agency" as the named plaintiff by alleged assignment at any time prior to November 30, 2002; and/or all such persons as to whom one or more of the defendants did or will engage in any debt collection activity in relation thereto on or after March 2, 2001.

On November 10, 2006, Northland moved to intervene in this action as a third-party defendant. Northland issued an insurance policy to Dickerson and D.B.S. in which Northland agreed to indemnify them against any damages resulting from legal proceedings arising from the "wrongful acts" covered by the Policy (the "Policy). On December 27, 2006, the Court granted Northland's motion to intervene.

On February 16, 2005, the Fosters moved for partial summary judgment on behalf of themselves and the certified class on their FDCPA and OCSPA claims.  On August 15, 2005, Defendant Coffman and Defendant Dickerson each moved for summary judgment on all remaining claims against them in the Complaint.

On December 5, 2006, the Court granted Plaintiffs' Motion for Partial Summary Judgment as to Defendants' liability under the FDCPA and the OCSPA, but denied it as to Plaintiffs' damages calculation.  *Foster v. D.B.S. Collection Agency*, 463 F. Supp. 2d 783 (S.D. Ohio 2006).  The Court denied Dickerson's and Coffman's Motions for Summary Judgment in their entirety.  *Id*.

On January 20, 2007, Coffman asked this Court to certify its summary judgment opinion for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) because he alleged that it "involves a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).  On September 25, 2007, this Court denied Coffman's motion.

Currently before the Court is Northland's Motion for Summary Judgment.  Northland asks this Court to declare that it need not indemnify D.B.S./Dickerson on several of the claims against them in this action.  Plaintiff opposes this Motion.  It is now ripe for adjudication.

### III.  STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant has the burden of establishing that there are no genuine

issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Vatrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993).  In response, the nonmoving party must present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339-40 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the nonmoving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In responding to a motion for summary judgment, however, the nonmoving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see Celotex, 477 U.S. at 324; Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir. 1995).

## IV.  ANALYSIS

### A.  Introduction

Northland alleges that the Policy specified that it need not defend or indemnify

D.B.S./Dickerson against claims involving: (1) multiplied damages awards; (2) punitive

damages; (3) violations of the Ohio Consumer Sales Practices Act; (4) fraud; (5) violations of

the Ohio Corrupt Practices Act; or (6) disgorgement/reimbursement. Plaintiff contends that the

Policy does not exempt these claims and/or damage awards from its coverage. The relevant

portions of the Policy read as

follows:

### Section A: Insuring Agreement

[Northland] will pay on behalf of an Insured all **Loss** from **Claims** first made against
an Insured . . . for **Wrongful Acts** committed . . . .

### Section B: Definitions

3) **Claim** means:

> a. Any proceeding in a court of law or equity . . . against an Insured for a
> **Wrongful Act**, including any appeal therefrom.

16) **Loss** means judgments and settlements, *including punitive or exemplary
damages*, which an Insured is legally obligated to pay by reason of a Claim, and
Defense Expenses. **Loss** shall not include:

> a. Fines, sanctions, taxes, penalties imposed by law or *multiplied portion of
> any multiplied damages award*;

> b. Matters which are uninsurable under the law of the most favorable
> jurisdiction pursuant to which this Policy shall be construed . . . . (italics
> added).

20) **Wrongful Act** means:

> a. A violation of the Federal Fair Debt Collection Practices Act (FDCPA) or
> the Fair Credit Reporting Act (FCRA) and as further amended, or *other
> similar state statutes*;

> b. Any actual or alleged act, error, omission, misstatement, misleading
> statement or breach of fiduciary or other duty; or

11

     c. Any actual or alleged libel, slander, or oral or written publication of defamatory or disparaging material;

by any Insured in rendering or failing to render Professional Services.  (Italics added)

**Section C: Exclusions**

[Northland] will not be liable for **Loss** in connection with any **Claim**:

1) Based upon, arising from, or in consequence of any Insured having committed:

     a. Any dishonest, *fraudulent* or criminal act or omission;

     b.  Any willful or intentional violation of any federal or state statute, regulations, rule, decree or similar law or act; or

     c. The gaining of any profit, remuneration or advantage to which the Insured was not legally entitled; (italics added)

However, this Exclusion 1, shall not apply unless there is a final judgment or adjudication that establishes that the Insured participated or acquiesced in la, 1b or 1c above, at which point [Northland] will have no further duty to defend the Insured, and the Insured shall reimburse [Northland] for any Defense Expenses incurred . . . .

13) Based upon, arising from, or in consequence of disgorgement or reimbursement of monies collected by the Insured.

## B.  General Rules

     In general, under Ohio choice of law rules, the law of the state of issuance governs the construction of an insurance policy.  *See*, *e.g.*, *Miller v. State Farm Mut. Auto. Ins. Co.*, 87 F.3d 822 (6th Cir. 1996); *Nationwide Mut. Ins. Co. v. Ferrin,* 487 N.E.2d 568 (Ohio 1986).  Northland issued the Policy to Dickerson in Zanesville, Ohio.  The Plaintiff class consists only of persons "named as a party defendant in an *Ohio* civil action . . . ."  Neither party disputes that Ohio law controls.  No other state serves as a conceivable nexus for the events surrounding the Policy.  Thus, this Court will apply Ohio law to the construction of the Policy.

Under Ohio law, a Court shall interpret an insurance policy by applying the rules of construction applicable to contract law. *Monticello Ins. Co. v. Hale*, 284 F. Supp. 2d 898, 901 (S.D. Ohio 2003).  The role of the Court in interpreting an insurance policy is to give effect to the intent of the parties. *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003).  The Court will liberally construe the policy in favor of the insured without applying an unreasonable interpretation to the terms of the policy. *Id*. at 1262.  The unambiguous terms of a contract bind a court.  The Court must look to the plain and ordinary meaning of the language of an insurance contract to construe this intent "unless another meaning is clearly apparent from the contents of the policy." *Id*. at 1261.  If the language of the contract is clear, the Court may not accept alternate interpretations. *Id*.  A particular provision of a contract is unambiguous if it can be given a definite legal meaning. *Id*.

However, if a Court finds a contract provision to be ambiguous, it must be construed strictly against the insurance company. *Id*. at 1262.  Moreover, where the plaintiff is not a party to policy at issue, as in this case, the plaintiff is not in a position to urge that the contract be construed strictly against one of the parties. *Id*.  Further, if a policy contains exclusions to coverage, those exclusions must "be clear and specific and a 'general presumption arises to the effect that which is not clearly excluded from the operation of such contract is included in the operation thereof.'" *Monticello*, 284 F. Supp. 2d at 901-02.  (citation omitted).

### C.  Northland's Allegations

#### 1.  Treble Damages

Northland claims that the Policy excludes coverage for treble damages.  Northland is correct.  Section B(16)(a) of the Policy excludes any "multiplied portion of any multiplied

damages award" from the Policy's coverage.  Treble damages are "damages that, by statute, are three times the amount that the fact-finder determines is owed." Black's Law Dictionary (8th ed. 2004).  "Three times" is a multiple, and thus, treble damages fall within the above exclusion. Plaintiff concedes that the Policy does not cover treble damages.  Thus, Northland's Motion for Summary Judgment, as it pertains to treble damages, is **GRANTED**.  Northland need not indemnify Dickerson/D.B.S. for treble damages that a jury or court may award Plaintiff against Dickerson/D.B.S.

**2.  Punitive Damages**

Northland claims that the Policy excludes coverage for punitive damages.  Specifically, Northland asserts that both O.R.C. 3937.182 and Ohio public policy prohibit insurance policies from covering punitive damages.  Thus, Northland contends that punitive damages are excluded from the Policy's coverage because they are "matters . . . uninsurable under the law of the most favorable jurisdiction pursuant to which this Policy shall be construed."  Policy, Section B(16)(b).

Plaintiff retorts that because Section B(16) specifically includes "punitive or exemplary damages," the Policy must cover any punitive damages that may be ordered against Dickerson/D.B.S.

Northland's first contention, that O.R.C. 3937.182 prohibits an insurance policy from covering punitive damages, is without merit.

O.R.C. 3937.182 reads, in relevant part:

> (B) No policy of automobile or motor vehicle insurance that is covered by sections 3937.01 to 3937.17 of the Revised Code, including, but not limited to, the uninsured motorist coverage, under insured motorist coverage, or both uninsured and under insured motorist coverages included in such a policy as authorized by section 3937.18 of the Revised Code, and that is issued by an insurance company licensed to do business in this state, and no other policy of

14

casualty or liability insurance that is covered by sections 3937.01 to 3937.17 of the Revised Code and that is so issued, shall provide coverage for judgments or claims against an insured for **punitive or exemplary damages**.

(C) This section applies only to policies of automobile, motor vehicle, or other casualty or liability insurance as described in division (B) of this section that are issued or renewed on or after the effective date of this section.

(Emphasis added)

Northland, without providing any supporting evidence, claims that it is a "casualty" insurance company as specified in O.R.C. 3937.182(c) above. Casualty insurance, as defined by Black's Law Dictionary, means:

An agreement to indemnify against loss resulting from a broad group of causes such as legal liability, theft, accident, property damage, and workers' compensation. The meaning of casualty insurance has become blurred because of the rapid increase in different types of insurance coverage.

Black's Law Dictionary (8th Ed. 2004)

As Black's notes, however, casualty insurance is synonymous with "accident" insurance. The Policy is designed to insure against unlawful or harmful debt collection practices, not any form of an accident. Moreover, a plain reading of O.R.C. 3937.01 through O.R.C. 3937.17 indicates that these laws are designed primarily to apply to motor vehicle insurance or other types of accident insurance. O.R.C. 3937.18 only applies to motor vehicle insurance.[5] *The Corinthian v. Hartford Fire Ins. Co.*, 758 N.E.2d 218, 221 (Ohio 8th Dist. 2001) ("The Ohio General Assembly in 1986 amended O.R.C. 3937.18 to expressly prohibit the payment of punitive damages in uninsured and under insured motorist coverage.") Finally, until recently,

---

[5] Sections 3937.01 to 3937.16 of the Revised Code apply to casualty insurance including fidelity, surety, and guaranty bonds, and to all forms of motor vehicle insurance, on risks or operations in this state . . . .

there has been substantial difference of opinion regarding whether Ohio public policy precludes insurance against punitive damages in certain cases. *See, e.g., id.* (holding that neither Ohio public policy nor statute prohibited an insurance coverage of punitive damages relating to violation of Nursing Home Patients' Bill of Rights.)  If O.R.C. 3937.182(c) prohibited punitive damages in cases such as these, there would be no debate regarding whether public policy precludes their coverage–– because the statute would explicitly exclude the coverage.  Thus, this Court finds that O.R.C. 3937.182(c) does not prohibit the insurance of punitive damages in debt collection actions.

Next, relying on *Lumbermens Mut. Cas. Co. v. S-W Industries, Inc.*, 39 F.3d 1324, 1329 (6th Cir. 1994), Northland argues that Ohio public policy precludes insurance coverage for punitive damages.  In *Lumbermens*, the Sixth Circuit stated:

> To date, the Ohio Supreme Court has not ruled directly on the question of whether Ohio's public policy forbids the indemnification of punitive damage awards. The Ohio Court of Appeals, however, has held that such coverage would violate Ohio public policy. *Casey v. Calhoun*, 40 Ohio App.3d 83, 531 N.E.2d 1348, 1351 (1987).
>
> Therefore, we think it clear, and now hold, that Ohio law prohibits the indemnification of monies paid pursuant to an award of punitive damages arising out of the insured's own conduct.

Northland, however, neglects to examine subsequent case law.  In *Corinthian*, an Ohio appellate court faced the question of whether an Ohio statute or Ohio public policy precluded insuring against punitive damages that may stem from violations of the Nursing Home Patients' Bill of Rights.  *Corinthian*, 758 N.E.2d 218.  The *Corinthian* court, like the Sixth Circuit in *Lumbermens*, began its analysis with a discussion of the reasons public policy might prohibit insurance coverage for punitive damages.  Both courts concluded that "an individual should not be able to escape punishment for his or her intentionally malicious acts and that the deterrent

16

effect of punitive damages would be diminished if tortfeasors can be indemnified against them."

*Id*. at 223.  The *Corinthian* court then reasoned, however, that this logic is not valid "where

punitive damages are awarded pursuant to statute, without any finding of malice, ill will, or other

culpability" because a deterrent effect is not served absent a malicious state of mind.  *Id*.

Subsequently, the court examined the plain language of the policy.  It noted that the

insurance company, as the drafter of the policy, had the opportunity to exclude punitive damages

from coverage but chose not to.  *Id.  See also Medical Liability Mut. Ins. Co. v. Alan Curtis*

*Enterprises, Inc.*, 2006 WL 3542986, (E.D. Ark. Dec. 8, 2006) ("The greater risk to good public

policy--in this Court's opinion--is for insurance companies to issue policies which appear to

provide coverage for punitive damages, and then call upon the courts to rewrite the policy to

eliminate coverage for which the insured contracted, paid and relied upon.").  In this case, the

Policy goes a step farther than that in *Corinthian*.  It explicitly includes punitive damages within

its coverage.  Policy, Section B(16) ("**Loss** means judgments and settlements, *including punitive*

*or exemplary damages*.").  In *Corinthian*, the fact that the policy did not exclude punitive

damages, combined with the court's conclusion that Ohio law does not prohibit insurance

coverage of punitive damages in all cases, led the court to hold that the policy in question could

indemnify the defendants against an award of punitive damages, so long as the punitive damages

were awarded pursuant to a statute and without any finding of malice, ill will, or other

culpability.  *Corinthian*, 758 N.E.2d at 223.

This Court must rule in accord with the most recent Ohio law.  *Corinthian* is that law.

Thus, this Court holds that to the extent that Plaintiffs are awarded punitive damages pursuant to

a statute without any finding of malice, ill will, or other similar culpability, Northland must

indemnify Dickerson/D.B.S. against those damages.  If punitive damages are awarded after a

finding of malice, ill will, or other similar culpability, or are awarded other than pursuant to a statute, Ohio public policy forbids their indemnification.

### 3.  Ohio Consumer Sales Practices Act Claim

Northland avers that it need not defend or indemnify Dickerson/D.B.S. against Plaintiffs' OCSPA claim because Section C(1)(b) of the Policy excludes coverage for any "willful or intentional violations . . ." of law.  In support of this argument, Northland cites Plaintiffs' Complaint which accuses Defendants of violating the OCSPA in a "knowing, intentional, and deliberate" manner.  Thus, Northland argues that Plaintiffs' OCSPA claim falls under the Section C(1)(b) exception to coverage.  Plaintiffs retort that a plaintiff need not prove willfulness or intent in order to succeed on OCSPA claim.  As such, they argue that their OCSPA claim does not necessarily fall within the Section C(1)(b) exception.

Northland's argument is meritorious.  The Ohio Consumer Sales Practices Act is remedial legislation and is to be construed liberally. *Renner v. Procter & Gamble Co.*, 561 N.E.2d 959, 965-966. (Ohio 1988).  This legislation prohibits a supplier from committing unfair or deceptive acts in a consumer transaction.  O.R.C. 1345.02(A).  "Intent or knowledge is not an element of a Consumer Sales Practices Act ('CSPA') laundry list claim unless the Act itself requires intent." *Fletcher v. Don Foss of Cleveland*, *Inc.*, 628 N.E.2d 60, 62 (Ohio 1993); *see also Renner v. Derin Acquisition Corp.*, 676 N.E.2d 151, 157 (Ohio 8th Dist. 1996); *Thomas v. Sun Furniture & Appliance Co.*, (1978) 399 N.E.2d 567 (Ohio 1978) (holding that it is not a defense to a OCSPA claim to show that the act was not done intentionally, or without knowledge that it was false, misleading or deceptive.)  Rather, "it is sufficient that the conduct complained of 'has the likelihood of inducing in the mind of the consumer a belief which is not in accord with the facts.' " *Renner v. Derin Acquisition Corp.*, 676 N.E.2d at 157 (citations omitted).

The Court's inquiry, however, does not end here. Just because a defendant's intent or knowledge is irrelevant to whether a plaintiff may succeed on an OCSPA claim does not mean that Dickerson/D.B.S.'s intent or knowledge is irrelevant in this case. If Dickerson/D.B.S. committed their violations of the OCSPA willfully or intentionally, then this claim would be exempt from the Policy's coverage pursuant to the Section C(1)(b) exception.

It matters not what Plaintiffs alleged in their Complaint but rather the facts upon which a jury or court used to find Defendants liable for violating the OCSPA. In order to determine whether Dickerson/D.B.S.'s violations of the OCSPA were intentional or willful, this Court turns to its conclusions in its previous summary judgment opinion in this case. In that opinion, this Court held that Defendants' debt "collection practices constitute deceptive acts under the OCSPA for the reasons set forth above [in the analysis of Defendants' violations of the FDCPA] . . . " and thus granted summary judgment for Plaintiffs on their OCSPA claim. The Court found that Dickerson/D.B.S. committed four types of unfair or deceptive acts. First, they failed to register the name "D.B.S. Collection Agency" with the Ohio Secretary of State and therefore lacked the legal capacity to collect debts. Second, they stated in court papers that they had the right to collect attorney's fees when they did not have the legal ability to do so. Third, they filed debt collection actions against debtors' spouses when the spouses did not have the legal obligation to pay the debts. Fourth, their debt collection practices constituted the unauthorized practice of law because D.B.S. never owned valid assignments from the original creditors under Ohio law.

In concluding that these four actions constituted violations of the OCSPA, this Court did not find, or even infer, that D.B.S./Dickerson acted intentionally or willfully. The Court, however, did reject their bona fide error defense. Defendants may escape liability if they can prove that they can show "by a preponderance of the evidence that the violation was not

intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error." 15 U.S.C. § 1692k(c); *Edwards v. McCormick*, 136 F. Supp. 2d 795, 800 (S.D. Ohio 2001). The Court found that Defendants failed to prove by a preponderance of the evidence that their illicit actions resulted from a bona fide error. This conclusion, however, does not serve as a finding that Defendants did act with willfulness or intent when violating the OCSPA.

A finding of intent is absent from this Court's grant of summary judgment in favor of Plaintiffs on their OCSPA claim. Northland presents no additional evidence which supports the conclusion that Dickerson/D.B.S. acted intentionally, willfully, or maliciously when it failed to register with the Ohio Secretary of State nor when it filed complaints against various debtors in state court. Thus, simply put, Northland has failed to show that Dickerson/D.B.S. acted in an intentional manner when they violated the OCSPA such that the Section C(1)(b) exception would apply. Therefore, the Court **DENIES** Northland's Motion for Summary Judgment as it applies to the OCSPA claims.

### 4. Common Law Fraud Claim

Northland contends that it need not defend or indemnify Dickerson/D.B.S. against Plaintiffs' fraud claim because Section C(1)(b) of the Policy excludes coverage for any "willful or intentional violations . . ." of law and Section C(1)(a) excludes "any dishonest, *fraudulent* or criminal act or omission." (italics added).

Unlike an OCSPA claim, intent is a required element of a fraud claim under Ohio law. *See Kreiner, Uhlinger & Edmonds Co., L.P.A. v. State Farm Fire & Cas. Co.*, 1991 WL 302446, at *3 (Ohio 5th Dist. Dec. 23, 1991) ("fraud is an intentional tort, with "intent" as one of its

elements"); *Andersons, Inc. v. Consol, Inc.*, 348 F.3d 496, 505 (6th Cir. 2003) ("To establish a claim for intentional misrepresentation/fraud under Ohio law, the plaintiff must show: . . . (d) [defendant acted] with the intent of misleading another into relying upon it"). Thus, Plaintiffs' fraud claim is excluded from coverage pursuant to Section C(1)(b) of the Policy. Moreover, if Plaintiffs are to succeed on their fraud claim, they necessarily must show that Defendants acted fraudulently. Thus, this claim would also be excluded pursuant to Section C(1)(a) which precludes "fraudulent acts" from coverage.

Plaintiffs retort that the Policy covers all "wrongful acts," including fraud. Section B(20)(b) of the Policy defines a "wrongful act" as, among other things, "any actual or alleged act, error, omission, misstatement, misleading statement or breach of fiduciary or other duty." Plaintiffs contend that because fraud falls within this definition of a "wrongful act," the Policy must indemnify Dickerson/D.B.S. in the event that Plaintiffs succeed on their fraud claim.

Plaintiffs are correct in their contention that "fraud" is a wrongful act within the Policy's ambit. Plaintiffs, however, misread the Policy's exclusions. First, the Policy generally describes what acts are covered. Then, it excludes specific acts. An insurance policy is to be read from beginning to end with the more specific provisions governing the general ones. *See*, *Monsler v. Cincinnati Cas. Co.*, 598 N.E.2d 1203, 1209 (Ohio 10th Dist. 1991) ("A fundamental principle of contract construction requires that the document be read as a whole in order to identify the intent of the parties. A specific provision controls over a general one."). The Policy does not cover the acts it specifically excludes from coverage such as the intentional tort of fraud.

The only question that remains is whether the end of Section C(1) prevents this Court from granting summary judgment to Northland pertaining to Plaintiffs' fraud claim. The end of Section C(1) reads:

> However, this Exclusion 1, shall not apply unless there is a final judgment
> or adjudication that establishes that the Insured participated or acquiesced in
> la, 1b or 1c above, at which point [Northland] will have no further duty to
> defend the Insured, and the Insured shall reimburse [Northland] for any
> Defense Expenses incurred . . . .

Plaintiffs contend that because Plaintiffs' fraud claim has not been adjudicated, the

exclusions in Section C(1) do not apply.  Northland responds that it is only asking this Court to

declare that "if Plaintiffs obtain judgment against Dickerson for fraud, Northland will have no

obligation to indemnify Dickerson for that judgment."  Based on a plain reading of Section C(1),

the exclusion for fraud does not apply until a final judgment has been issued on a particular

claim.  But, Plaintiffs cannot succeed on their fraud claim in a manner that does not invoke the

exemptions in Section C(1).  The Court concludes that there would be a waste of judicial

resources by requiring Northland to make an additional motion once the fraud claim has been

fully adjudicated.  Thus, the Court **GRANTS** Northland's Motion for Summary Judgment as it

pertains to the fraud claim and finds that if Plaintiffs succeed on their fraud claim against

Defendants, Northland need not indemnify Dickerson/D.B.S.

Additionally, under Ohio law, an insurance contract may not indemnify a party for

damages resulting from a suit for an intentional tort.  *Wedge Products, Inc. v. Hartford Equity

Sales Co.*, 509 N.E.2d 74, 76 (Ohio 1987).  Thus, pursuant to Section B(16)(b) of the Policy,

which exempts from coverage matters which are uninsurable under state law, Northland need not

indemnify Dickerson/D.B.S. against Plaintiffs' tort claim.  The Policy contains no requirement

of full adjudication of a claim before a Court may apply Section B(16).

### 5.  Ohio Corrupt Practices Act Claim

Northland avers that it need not defend or indemnify Dickerson/D.B.S. against Plaintiffs'

OPCA claim because Section C(1) of the Policy excludes from coverage, among other things,

"any dishonest, *fraudulent* or criminal act or omission." (italics added).  In support of this argument, Northland cites Plaintiffs' Complaint which accuses Defendants of violating the OPCA by committing forms of "fraud" and other "illegal" acts.  *See* Complaint 77-8.  Plaintiffs counter that Northland has not established that a successful OPCA claim *must* involve proof that Dickerson committed an act within the ambit of one of the Section C(1) exemptions. Specifically, without citing any precedent for the proposition, Plaintiffs allege that it is possible for a jury to find Dickerson liable for a violation of the OPCA only vicariously, solely due to her association with Coffman.  Plaintiffs argue that if a jury finds Dickerson vicariously liable, the OPCA claims somehow fall out of the purview of the Section C(1) exemptions.

To sustain a successful OPCA claim, a plaintiff must prove: "(1) conduct of the defendant which involves the commission of two or more of specifically prohibited state or federal criminal offenses; (2) the prohibited criminal conduct of the defendant constitutes a pattern of corrupt activity; and (3) the defendant has participated in the affairs of an enterprise or has acquired and maintained an interest in or control of an enterprise."  *Universal Coach, Inc.*, 629 N.E.2d at 32 (citing *Sedima S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985)).  Under the OPCA, a "pattern of corrupt activity" consists of "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event."  O.R.C. § 2923.31(E).

In their Complaint, Plaintiffs allege that Defendants, two individuals and a sole proprietorship, have participated in and constituted an association in fact to collect consumer debts allegedly owed to third parties since August 10, 1998.  They claim that the enterprise regularly pursued its endeavor by filing approximately ten to twenty Ohio court actions to collect consumer debt each month between August 1998 and March 2001.  Plaintiffs contend that the

suits commenced and maintained by Defendants are void ab initio due to Defendants' lack of

legal capacity to bring those suits.  Further, Plaintiffs assert that Defendants' actions constitute a

pattern of corrupt activity, in that commencing, maintaining, and collecting on judgments

derived from civil suits that are void involves separate occurrences of mail fraud,

telecommunications fraud, and theft.  Plaintiffs allege that Defendants performed these acts

knowingly and in reckless disregard of the Plaintiffs' rights.

Simply put, it is impossible for Plaintiffs to succeed on their OPCA claim without

establishing that Defendants committed two or more criminal offenses.  Plaintiffs offer no

precedent which establishes that they can succeed on a OPCA against Dickerson based on

vicarious liability.  Even if they did so, Dickerson would also have committed a criminal

offense—under Ohio's Corrupt Activities Act assisting the commission of a crime is itself a

crime—and thus be just as liable for the crime as the one who committed it .  *See State v. Siferd*,

783 N.E.2d 591 (Ohio 3rd Dist. 2002).

Section C(1) of the Policy exempts from coverage any claim involving a "criminal act or

omission."  Plaintiffs must prove that Defendants committed a crime in order to succeed on their

OPCA claim.  Thus, the Court **GRANTS** summary judgment in favor of Northland as it pertains

to the OPCA claim and declare that Northland need not indemnify Dickerson/D.B.S. against

damages resulting from Plaintiffs' OPCA claim.

### 6. Disgorgement/Reimbursement as Damages

Northland asks this court to declare that the Policy does not cover "any claim for

reimbursement of amounts Dickerson wrongfully collected from Plaintiffs."  In doing so,

Northland cites Section C(13) of the Policy that states that Northland will not be liable for any

loss in connection with a claim:

> Based upon, arising from, or in consequence of disgorgement or reimbursement of monies collected by the Insured.

Plaintiffs argue that the Policy covers "actual damages recoverable under the FDCPA."

Northland's request for relief is unclear. To the extent that there is a specific award of "reimbursement or disgorgement" Section C(13) specifies that Northland need not indemnify Dickerson/D.B.S. Beyond that, Section C(13) is ambiguous. The Court is unclear what a claim "based upon" disgorgement or reimbursement means and Northland provides no specific explanation. It certainly does not exempt any civil damages recoverable under the FDCPA from the Policy's coverage. As evinced by Section B(20)(a), the Policy is specifically designed to insure against claims arising from debt collecting activity, specifically including violations of the FDCPA. It would be contradictory to insure a debt collector against an FDCPA claim, but not insure it against the damages resulting therefrom.[6] Additionally, none of Plaintiffs' other claims is based on reimbursement. They are all based on specific provisions of law, which the penalties for violating are statutory and civil damages. Thus, Section C(13) does not appear to exclude anything arising from Plaintiffs' claims from the coverage of the Policy. However, if this Court specifically orders reimbursement or disgorgement against Defendants, Northland will not have to indemnify Dickerson/D.B.S. for those monies.

----

[6] 15 U.S.C.A. § 1692k states that the damages for a violation of the FDCP are:

(1) any actual damage sustained by such person as a result of such failure;

(2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or

(B) in the case of a class action, (I) such amount for each named plaintiff as could be recovered under subparagraph (A), and (ii) such amount as the court may allow for all other class members, without regard to a minimum individual recovery, not to exceed the lesser of $500,000 or 1 percent of the net worth of the debt collector.

### D.  Procedural Arguments

Plaintiffs assert two additional reasons this Court should rely on in denying Northland's Motion in its entirety.  First, Plaintiffs claim that Northland is not a party to the Policy, and that a company named Gulf Insurance Group is the "real" insurer.  As such, they argue that Northland does not have standing to bring this Motion.  But, while Gulf Insurance Group may have drafted the policy, the declarations accompanying the policy clearly and unambiguously state that "Northland Insurance Company" issued and will insure the policy.  Thus, Plaintiffs' first argument is without merit.

Second, Plaintiffs argue that Northland did not certify itself as a "defendant class" under Rule 23 and therefore has no standing in this action.  This argument is also without merit. Plaintiffs have properly been certified as a class. Northland has properly moved for, and been granted, intervention into this action as a third-party defendant.  Northland has properly asserted its rights against other Defendants Dickerson/D.B.S.  Technically, given that Northland is asserting its rights against Dickerson/D.B.S., Plaintiffs need not even be involved in the adjudication of this Motion.  In any event, nothing transpired in this case requiring Northland to certify itself as a defendant class.

### V.  CONCLUSION

For the reasons stated herein, the Court **GRANTS in part and DENIES in part** Northland's Motion for Summary Judgment.  In summary, the Court has held that:

(1) Northland need not indemnify Dickerson/D.B.S. for treble damages that a jury or court may award Plaintiff against Dickerson/D.B.S.;

(2) To the extent that Plaintiff's are awarded punitive damages pursuant to a statute without any finding of malice, ill will, or other similar culpability, Northland must indemnify Dickerson/D.B.S.

against those damages.  If punitive damages are awarded after a finding of malice, ill will, or other similar culpability, or are awarded other than pursuant to a statute, Ohio public policy forbids their indemnification;

(3) Northland's Motion for Summary Judgment as it applies to the OCSPA claims is denied;

(4) Northland need not indemnify Dickerson/D.B.S. against Plaintiffs' tort claim;

(5) Northland need not indemnify Dickerson/D.B.S. against damages resulting from Plaintiffs' OPCA claim; and

(6) If this Court specifically orders reimbursement or disgorgement against Defendants, Northland will not have to indemnify Dickerson/D.B.S. for those monies.  The Court, however, denies Northland's Motion insofar as it requests that this Court find that any of Plainitffs' claims are "based on disgorgement or reimbursement."

**IT IS SO ORDERED.**



  **s/Algenon L. Marbley**
**ALGENON L. MARBLEY**
**United States District Court Judge**


**DATED: March 20, 2008**